NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

———————————————

STATE OF ARIZONA, *Appellee*,

*v.*

ERIKIAH OSBORNE, *Appellant*.

No. 1 CA-CR 13-0837
FILED 12-02-2014

———————————————

Appeal from the Superior Court in Maricopa County
No. CR2013-115808-001
The Honorable Margaret R. Mahoney, Judge

**AFFIRMED**

———————————————

COUNSEL

Office of the Attorney General, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

Maricopa County Public Defender, Phoenix
By Margaret M. Green
*Counsel for Appellant*

———————————————

**MEMORANDUM DECISION**

Judge John C. Gemmill delivered the decision of the Court, in which
Presiding Judge Patricia K. Norris and Judge Lawrence F. Winthrop joined.

———————————————

**G E M M I L L**, Judge:

¶1        Defendant Erikiah Karlyn Osborne appeals his conviction for aggravated assault, a class 3 dangerous felony.  On appeal, Osborne argues that the trial court erred when it denied his motion for mistrial based on the jury hearing a recorded police interview of the victim's mother during its deliberations that was not entered into evidence at trial.  For reasons set forth below, we affirm.

## BACKGROUND

¶2        The applicable standard of review requires that we view the facts in the light most favorable to sustaining the jury's verdict and resolve all reasonable inferences against defendant.  *State v. Vendever*, 211 Ariz. 206, 207 n.2, 119 P.3d 473, 474 (App. 2005).  Osborne was accused of chasing and threatening one of his neighbors with a machete.   During the trial, the jurors heard testimony to this effect from the victim, the victim's mother, and four other witnesses related to the victim, all of whom resided at the victim's house at the time of the incident.  The jurors also heard from Osborne's roommate, who testified that he saw Osborne hide his machete under a mattress shortly before it was located by police who responded to a 911 call.  Osborne testified at trial and maintained that the victim and the witnesses were all lying, that the victim had attacked him, and that he had never removed the machete from its storage place under the mattress on the day of the incident.  Based on Osborne's testimony, the trial court instructed the jury on self-defense.

¶3        The jury retired to deliberate on September 25, 2013, but did not reach a verdict that day and resumed their deliberations the following morning.  On September 26, the trial judge met with counsel out of the presence of the jury to inform counsel about a matter that had been brought to her attention by the bailiff when she had returned from a lunch meeting. The bailiff explained that when the jury had started up the computer to listen to one of the 911 tapes that had been entered into evidence, "an audio played."  A juror had then handed the bailiff a CD marked "Hope S . . . ," which the bailiff had listened to over the lunch break and determined was an interview of Hope, the victim's mother, by one of the officers.[1]  The bailiff

---

[1] The CD was apparently inadvertently left inside the laptop computer that was provided to the jury to utilize if they wanted to listen to tapes of the

reported that he asked the jury members "how long they listened to it," and they informed him "about two to three minutes" until they realized it was something they had not heard during the trial.

¶4        The trial judge, counsel, and Osborne listened to the CD of the interview.  The court and counsel noted that at "around two minutes" there was reference to the fact that "[Osborne] was bad news," and that was why Hope stopped him from coming to her house.  They also noted that, "sometime just before 3:40 [on the recording]," Hope mentioned seeing "a [B]lack man with a gun."[2]  Both counsel agreed that the reference to Osborne's friend was something that they had agreed would be "kept out of the trial."  Once they had listened to the entire recording, which lasted approximately seven minutes, defense counsel stated, "I don't know if you want to bring the jury in, but my position right now is that I would ask for a mistrial."  Nonetheless, the parties were unclear about how much of the CD the jurors had actually listened to, and defense counsel agreed that they should talk to the jurors and "make a record" about what precisely they had heard.  Defense counsel suggested that the judge bring each juror in separately because she wanted to obtain "their own independent memory of what they heard."

¶5        The trial judge instructed the jurors to "stop deliberations and not consider the case any further until the Court permits it."  Thereafter, the trial judge brought each one of the eight jurors into the courtroom separately to be questioned individually by counsel and the court about "what they remember[ed] hearing in the portion of the CD that was actually played and listened to" in the jury room.  Upon hearing from each juror what he or she had heard, the trial judge asked each one if he or she could disregard what he or she had heard and not have it affect his or her deliberations or the verdict in this case.  Each juror assured the court that he or she could.

¶6        When the last juror had been interrogated and had left the courtroom, the trial judge asked, "So is everybody satisfied that there was no harm done by virtue of that exhibit . . . being in the computer and heard,

_____

911 calls that were introduced at trial.  There is no allegation, either below or on appeal, of any intentional wrongdoing.

[2]  On the CD, Hope states that Osborne's "friend," a "[B]lack guy," came out, "stood at the gate," and stated, "if you guys call the cops I will kill you," and "pulled out a gun."

at least in part, by some of the jurors?" The prosecutor replied, "State agrees there's no issue." Defense counsel replied, "Yes, Your Honor." Addressing defense counsel specifically, the trial judge asked, "You agree there's no issue?" Defense counsel again replied, "Yes, Your Honor." The trial judge next stated that it was her intention to further instruct them:

> Do not have any further discussions . . . do not have any discussions with one another about what any of you talked about here in the courtroom . . . . [Y]ou're to set aside entirely anything you heard from that CD and not let it affect your deliberations in any way . . . . Each of you has told me that you're able to do that. Is there anybody who believes they're unable to do that?, and give them an opportunity to just affirm that they're capable of that."

Defense counsel replied, "Perfect."

¶7        The trial judge then brought the entire jury back into the courtroom and instructed them as she had stated. At the conclusion of the instructions, the trial judge stated:

> Each of you has told me that you're able to disregard [the CD] fully, set it aside out of your memory and not have it affect in any way your deliberations, and that's what I'm asking you to do. You've each told me independently you're able to do that. Is there anybody - - perhaps with, you know, the moments that have gone by, is there anybody that doubts they're able to do that?

Seeing no hands in response to her query, the trial judge dismissed the jury to return to its deliberations. After the jurors left the courtroom, the following exchange occurred between the trial judge and counsel:

> THE COURT: And I will have the record reflect that all - - all eight of the jurors did affirm that they were able to set it aside and not have it affect their deliberations. Counsel, you both saw that; correct?
>
> [DEFENSE COUNSEL]: Yes, Your Honor.
>
> [Prosecutor]: Yes, Your Honor.

4

THE COURT: Okay. So they're back to their deliberations.

\*\*\*

So we will let the jury just continue to deliberate. All right. [The bailiff] knows how to reach everybody when the time comes?

[DEFENSE COUNSEL]: Yep.

THE PROSECUTOR: Yes.

The jury deliberated for the remainder of the day and ultimately returned a guilty verdict when it returned to its deliberations on September 30, 2013, following the weekend break. On November 1, 2013, the trial court sentenced Osborne to a mitigated term of five years in prison, and Osborne timely appeals. This court has jurisdiction pursuant to the Arizona Constitution, Article 6, Section 9, and Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1)(1992), 13-4031 and 13-4033 (2010).

## ANALYSIS

¶8          On appeal, Osborne contends that the trial court abused its discretion when it denied his motion for mistrial. We find that Osborne effectively waived this argument on appeal when he abandoned his motion for mistrial and agreed that the trial court's remedial actions addressed his concerns and the jury might resume its deliberations. *See State v. McLemore*, 230 Ariz. 571, 582, ¶ 36, 288 P.3d 775, 786 (App. 2012) (noting defendant abandoned a motion by not asking the court to rule on that motion or objecting to court's proceeding without ruling on that motion, despite several opportunities to do so). The trial court here conscientiously consulted with defense counsel about the appropriate steps to take, and defense counsel affirmatively agreed with the trial court's proposals and never renewed his motion for mistrial despite ample opportunity to do so. Osborne has therefore forfeited the right to obtain appellate relief on this basis unless he can establish both that fundamental error exists and that the error in the case caused him prejudice. *See State v. Henderson,* 210 Ariz. 561, 567, ¶ 19, 115 P.3d 601, 607 (2005) (failure to object to alleged trial error limits defendant to fundamental error review on appeal).

¶9          Fundamental error is "error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial." *Id*. (internal quotation omitted). To prevail under this

standard of review, the burden is on defendant to "establish both that fundamental error exists and that the error in his case caused him prejudice." *Id.* at ¶ 20. Based on the record, we conclude the trial court did not commit any error, let alone fundamental error.

¶10        On appeal, Osborne is concerned with Hope's comments that he was "bad news" and that his friend had threatened them with a gun if they called police. At defense counsel's behest, the trial court questioned each juror separately to determine what, if anything, the juror had actually heard on the CD. The court also permitted counsel to question each juror. The court ascertained that the jurors had heard the tape the day before. Six of the jurors specifically stated that they had realized when they heard it that the information on the CD was not something that had been introduced at trial and, consequently, that they either were not to consider it or that it was not relevant to the incident. Three of the jurors acknowledged that they had stopped the CD and discussed as a group that it did not seem that the CD was played during the trial and that perhaps they should not be listening to it.

¶11        Three of the jurors could not remember any of the specifics about the conversation other than it was Hope speaking to a male or to an officer. Five of the jurors remembered mention of either "someone" or a "Black man" or "Black guy" with a gun. When questioned by either the court or defense counsel, none of the five thought that Hope was referring to Osborne. Additionally, defense counsel asked one of these jurors if that juror's view would be affected by the fact that someone whom Osborne "associated with carried a gun," and the juror replied "no," that he could "set that aside." After the juror left the courtroom, the trial judge asked defense counsel if she had an issue with that juror; she replied "No, Your Honor." Most importantly, all eight of the jurors, either when questioned as individuals by the trial judge and counsel or when questioned again collectively as a jury before returning to deliberations, assured the trial court that they could disregard the evidence and that it would have no bearing on their deliberations or the outcome of the case.

¶12        The trial court also gave a curative instruction, which defense counsel agreed was "perfect," before permitting the jurors to resume their deliberations. In the absence of evidence or reason to conclude otherwise, we follow the guidance of our supreme court that jurors are presumed to follow such curative instructions. *See State v. Dann,* 205 Ariz. 557, 571, ¶ 48, 74 P.3d 231, 245 (2003). Defense counsel apparently shared this philosophy

because she did not renew her motion for mistrial after participating in the questioning; and she agreed that the jurors should be permitted to continue their deliberations, given the curative instruction.

**¶13**　　　　The trial court did not err by not declaring a mistrial.  *See Lavers*, 168 Ariz. at 385, 814 P.2d at 342.　　Reversal is unwarranted.

## CONCLUSION

**¶14**　　　　For the foregoing reasons, we affirm Osborne's conviction and sentence.



**Ruth A. Willingham** · **Clerk of the Court**
F I L E D : gsh